1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9              FOR THE CENTRAL DISTRICT OF CALIFORNIA

10                         SOUTHERN DIVISION

11   UNITED STATES OF AMERICA,        SA CR No. **SACR 14-00034**

12            Plaintiff,              I N F O R M A T I O N

13            v.                      [18 U.S.C. § 371: Conspiracy;
                                      42 U.S.C. § 1320a-7b(b)(2)(A):
14   MICHAEL D. DROBOT,               Payment of Kickbacks in Connection
                                      with a Federal Health Care
15            Defendant.              Program]

16

17        The United States Attorney alleges:

18                             COUNT ONE

19                        [18 U.S.C. § 371]

20   A.   RELEVANT PERSONS AND ENTITIES

21        At all times relevant to this Information:

22        1.   Pacific Hospital of Long Beach ("Pacific Hospital") was a

23   hospital located in Long Beach, California, specializing in

24   surgeries, particularly spinal and orthopedic surgeries.  From at

25   least in or around 1997 to in or around November 2013, Pacific

26   Hospital was owned and/or operated by defendant MICHAEL D. DROBOT

27   ("defendant DROBOT").

28

2.    International Implants LLC ("I2") was a limited liability company owned and operated by defendant DROBOT that was located in Newport Beach, California.  I2 purchased implantable medical devices ("hardware") for use in spinal surgeries from original manufacturers and sold them to hospitals, particularly Pacific Hospital.  I2 was registered with the United States Food and Drug Administration as a repackager/relabeler, but was not registered as a manufacturer, and, in fact, did not manufacture medical devices.

3.    Ronald S. Calderon was an elected California State Senator ("Senator Calderon") who owed a fiduciary duty and a duty of honest services to the citizens of California, including his constituents in the 30th Senate District, which included, among others, the cities of Bell, Bell Gardens, Commerce, Cudahy, Montebello, Norwalk, Pico Rivera, Santa Fe Springs, and Whittier.

B.    RELEVANT LEGISLATION

4.    The California Workers' Compensation System ("CWCS") was a system created by California law to provide insurance covering treatment of injury or illness suffered by individuals in the course of their employment.  Under the CWCS, employers were required to purchase workers' compensation insurance policies from insurance carriers to cover their employees.  When an employee suffered a covered injury or illness and received medical services, the medical service provider submitted a claim for payment to the relevant insurance carrier, which then paid the claim.  Claims were submitted to and paid by the insurance carriers either by mail or electronically.  The CWCS was governed by various California laws and regulations.

5.    The California State Compensation Insurance Fund ("SCIF") was a non-profit insurance carrier, created by the California Legislature, which provided workers' compensation insurance to employees in California, including serving as the "insurer of last resort" under the CWCS system for employees without any other coverage.

6.    California law, including but not limited to the California Business and Professions Code, the California Insurance Code, and the California Labor Code, prohibited the offering, delivering, soliciting, or receiving of anything of value in return for referring a patient for medical services.

7.    Before January 2013, California law allowed a hospital to bill the cost of medical hardware separately from the other costs of a spinal surgery, such as the hospital's and surgeon's services, the reimbursement rates of which were set by a fee schedule.  The hardware was considered a "pass-through" cost and billing was limited to $250 over what the hospital paid for the hardware.

8.    Between in or around January 2010 and in or around August 2012, the California Senate and the Division of Workers' Compensation, an agency within the CWCS system, took several steps designed to modify or eliminate this pass-through.  This was due, in part, to studies that showed eliminating this pass-through could result in savings of as much as $60 million.

9.    By January 2013, California law was changed to eliminate the separate billing of medical hardware used in spinal surgeries; subsequently, reimbursement for all costs of such a surgery was limited to a fee schedule.

1    10.   The Federal Employees' Compensation Act ("FECA") provided

2  benefits to civilian employees of the United States, including United

3  States Postal Service employees, for medical expenses and wage-loss

4  disability due to a traumatic injury or occupational disease

5  sustained while working as a federal employee.   Benefits available to

6  injured employees included rehabilitation, medical, surgical,

7  hospital, pharmaceutical, and supplies for treatment of an injury.

8  The Department of Labor ("DOL") - Office of Workers' Compensation

9  Programs ("OWCP") was the governmental body responsible for

10 administering the FECA.   When a federal employee suffered a covered

11 injury or illness and received medical services, the medical service

12 provider submitted a claim for payment by mail or electronically to

13 Affiliated Computer Services ("ACS"), located in London, Kentucky,

14 which was contracted with the DOL to handle such claims.   Upon

15 approval of the claim, ACS sent payment by mail or electronic funds

16 transfer from the U.S. Treasury in Philadelphia, Pennsylvania, to the

17 medical service provider.

18    11.   Federal law prohibited the offering, delivering,

19 soliciting, or receiving of anything of value in return for referring

20 a patient for medical services paid for by a federal health care

21 benefit program.

22 C.   OBJECTS OF THE CONSPIRACY

23    12.   Beginning in or around 1998 and continuing to in or around

24 November 2013, in Orange and Los Angeles Counties, within the Central

25 District of California, and elsewhere, defendant DROBOT, together

26 with other co-conspirators known and unknown to the United States

27 Attorney, knowingly combined, conspired, and agreed to commit the

28 following offenses against the United States:   18 U.S.C. §§ 1341 and

4

1  1346 (Mail Fraud and Honest Services Mail Fraud); 18 U.S.C. §

2  1952(a)(3) (Interstate Travel in Aid of a Racketeering Enterprise);

3  18 U.S.C. § 1957 (Monetary Transactions in Property Derived from

4  Specified Unlawful Activity); and 42 U.S.C. § 1320a-7b(b)(2)(A)

5  (Payment or Receipt of Kickbacks in Connection with a Federal Health

6  Care Program).

7  D.   MANNER AND MEANS TO ACCOMPLISH THE CONSPIRACY

8       13.  The objects of the conspiracy were to be carried out, and

9  were carried out, in the following ways, among others:

10      a.   Defendant DROBOT and other co-conspirators offered to

11 pay kickbacks to dozens of doctors, chiropractors, marketers, and

12 others for their referring workers' compensation patients to Pacific

13 Hospital for spinal surgeries, other types of surgeries, magnetic

14 resonance imaging, toxicology, durable medical equipment, and other

15 services, to be paid primarily through the CWCS and the FECA.  For

16 spinal surgeries, typically, defendant DROBOT offered to pay a

17 kickback of $15,000 per lumbar fusion surgery and $10,000 per

18 cervical fusion surgery.

19      b.   Influenced by the promise of kickbacks, doctors,

20 chiropractors, marketers, and others referred patients insured

21 through the CWCS and the FECA to Pacific Hospital for spinal

22 surgeries, other types of surgeries, and other medical services.  The

23 workers' compensation patients were not informed that the medical

24 professionals had been offered kickbacks to induce them to refer the

25 surgeries and other medical services to Pacific Hospital.

26      c.   The surgeries and other medical services were

27 performed on the referred workers' compensation patients at Pacific

28 Hospital.

1         d.   I2, or, at times, another distributor who was a co-

2    conspirator, purchased medical hardware from a manufacturer and sold

3    it to Pacific Hospital for use in spinal surgeries.  Typically, the

4    price I2 or the co-conspirator distributor charged for the hardware

5    was inflated by a multiple of the price at which I2 or the other

6    distributor had purchased the device from the manufacturer.  At some

7    point, I2 included a stamp on its invoices falsely stating that I2

8    was an "FDA Registered Manufacturer."

9         e.   Pacific Hospital submitted claims, by mail and

10   electronically, to SCIF and other workers' compensation insurance

11   carriers for payment of the costs of the surgeries and other medical

12   services.  Included with the claims for spinal surgeries were the

13   inflated hardware invoices from I2 or the co-conspirator distributor.

14        f.   As defendant DROBOT and the other co-conspirators knew

15   and intended, and as was reasonably foreseeable to them, in

16   submitting claims for payment, Pacific Hospital made materially false

17   and misleading statements to, and concealed material information

18   from, SCIF and other workers' compensation insurance carriers,

19   including that a) Pacific Hospital did not disclose to the insurance

20   carriers that it had offered or paid kickbacks for the referral of

21   the surgeries and other medical services for which it was submitting

22   claims, and b) the hardware invoices were fraudulently inflated.

23        g.   The insurance carriers paid Pacific Hospital's claims,

24   by mail or electronically.

25        h.   Defendant DROBOT and other co-conspirators paid and

26   caused others to pay kickbacks to the doctors, chiropractors,

27   marketers, and others who had referred patients to Pacific Hospital

28   for surgeries and other medical services.

i.   To conceal the nature of the kickback payments from both workers' compensation insurance carriers and patients, defendant DROBOT, through one of the companies he owned and/or operated, entered into bogus contracts with the doctors, chiropractors, marketers, and others.  The services discussed in those contracts were, in fact, generally not provided or were provided at highly inflated prices; rather, the compensation paid was based on the number and type of surgeries and other medical services referred to Pacific Hospital.  Defendant DROBOT and his co-conspirators entered into the following bogus contracts, among others, in order to hide kickback payments:  collection agreements, option agreements, research and development agreements, lease and rental agreements, consulting agreements, marketing agreements, and management agreements.

j.   Defendant DROBOT and other co-conspirators kept records of the number of surgeries and other medical services performed at Pacific Hospital due to referrals from the kickback recipients, as well amounts paid to the kickback recipients for those referrals.  Periodically, defendant DROBOT and other co-conspirators amended the bogus contracts with the kickback recipients to increase or decrease the amount of agreed compensation described in the contracts, in order to match the amount of kickbacks paid or promised in return for referrals.

k.   The spinal pass-through, the provision of California law that allowed Pacific Hospital to fraudulently inflate the cost of the medical hardware used during spinal surgeries, was a vital component of defendant DROBOT's ability to pay kickbacks to the doctors, chiropractors, marketers, and others who had referred

patients to Pacific Hospital for surgeries and other medical
services.

l.    To prevent and delay steps being taken in the
California Senate and the Division of Workers' Compensation to limit
or eliminate the pass-through, as well as to promote legislative
efforts that would protect and expand his health care fraud scheme,
defendant DROBOT would pay bribes to Senator Calderon to influence,
and in exchange for, Senator Calderon's official acts relating to the
pass-through and other areas of workers' compensation and regulation.

m.    The bribe payments were primarily in the form of
hiring Senator Calderon's son to perform clerical duties at one or
more of defendant DROBOT's companies during the summers of 2010,
2011, and 2012, and paying Senator Calderon's son approximately
$10,000 per summer for approximately 15 days of work per summer.
Defendant DROBOT would also provide Senator Calderon a stream of
other financial benefits, such as trips on privately chartered
airplanes, golf at exclusive, high-end golf resorts, and meals at
expensive restaurants.

n.    In exchange for these financial benefits, defendant
DROBOT would have Senator Calderon perform official acts favorable to
defendant DROBOT in connection with the spinal pass-through and other
areas of worker's compensation legislation and regulation.  For
example, defendant DROBOT would have Senator Calderon arrange and
participate in meetings with other public officials and their staff,
where defendant DROBOT and Senator Calderon would attempt to convince
the other public officials and their staff to take action favorable
to defendant DROBOT in connection with the spinal pass-through and
other areas of worker's compensation legislation and regulation.

8

1   More specifically, this favorable action by Senator Calderon and

2   other public officials would support defendant DROBOT's ability to

3   commit and expand his health care fraud scheme.

4   E.   EFFECTS OF THE CONSPIRACY

5        14.  Had SCIF and the other workers' compensation insurance

6   carriers known the true facts regarding a) the payment of kickbacks

7   for the referral of workers' compensation patients for surgeries and

8   other medical services performed at Pacific Hospital, and b) the

9   fraudulent inflation of the cost of medical hardware used in spinal

10  surgeries, they would not have paid the claims or would have paid a

11  lesser amount.

12       15.  From in or around 2008 to in or around April 2013, Pacific

13  Hospital billed workers' compensation insurance carriers

14  approximately $500 million in claims for spinal surgeries that were

15  the result of the payment of a kickback; and defendant DROBOT or

16  other co-conspirators paid kickback recipients between approximately

17  $20 million and $50 million in kickbacks relating to those claims.

18  F.   OVERT ACTS IN FURTHERANCE OF THE CONSPIRACY

19       16.  In furtherance of the conspiracy and to accomplish the

20  objects of the conspiracy, defendant DROBOT and other co-conspirators

21  known and unknown to the United States Attorney, committed various

22  overt acts within the Central District of California, including but

23  not limited to the following:

24       Overt Act No. 1

25       On or about November 10, 2009, defendant DROBOT caused a check

26  in the amount of $43,650.00 from SCIF to be sent by mail to Pacific

27  Hospital in reimbursement for a claim for spine surgery on patient

28

1  J.M. performed by doctor C.D., which claim was induced by the payment

2  of a kickback to J.C.

3      Overt Act No. 2

4      In or around February 2010, defendant DROBOT met with

5  Senator Calderon in Sacramento, California, and agreed to hire

6  Senator Calderon's son each summer for the next several summers and

7  to pay him $10,000 per summer, so that Senator Calderon would have

8  enough money to pay for his son's college tuition.

9      Overt Act No. 3

10      On or about April 14, 2010, defendant DROBOT caused a check in

11  the amount of $90,467.80 from SCIF to be sent by mail to Pacific

12  Hospital in reimbursement for a claim for spine surgery on patient

13  L.T. performed by doctor M.C., which claim was induced by the payment

14  of a kickback to P.S.

15      Overt Act No. 4

16      In or around April 2010, defendant DROBOT had Senator Calderon

17  meet with a Director at the Division of Workers' Compensation and

18  discuss the negative impact that proposed regulations would have on

19  Pacific Hospital and other hospitals.

20      Overt Act No. 5

21      On or about July 13, 2010, defendant DROBOT caused Senator

22  Calderon's son to be paid $10,000 in advance of clerical work Senator

23  Calderon's son was to perform at one of defendant DROBOT's companies.

24  / / /

25  / / /

26  / / /

27  / / /

28

1    Overt Act No. 6

2    In or around February 2011, defendant DROBOT had Senator

3    Calderon meet with Senator A and request that Senator A introduce

4    legislation in the California Senate that would be favorable to

5    defendant DROBOT.

6    Overt Act No. 7

7    On or about March 31, 2011, defendant DROBOT caused a check in

8    the amount of $23,531.23 from Vanliner to be sent by mail to Pacific

9    Hospital in reimbursement for a claim for spine surgery on patient

10   R.S. performed by doctor S.O., which claim was induced by the payment

11   of a kickback to S.O.

12   Overt Act No. 8

13   On or about July 11, 2011, defendant DROBOT caused Senator

14   Calderon's son to be paid $5,000 for clerical work Senator Calderon's

15   son had performed at one of defendant DROBOT's companies.

16   Overt Act No. 9

17   On or about August 16, 2011, defendant DROBOT caused Senator

18   Calderon's son to be paid $5,000 for clerical work Senator Calderon's

19   son had performed at one of defendant DROBOT's companies.

20   Overt Act No. 10

21   On or about June 12, 2012, defendant DROBOT had Senator Calderon

22   arrange and participate in a meeting with Senator B, where Senator

23   Calderon and defendant DROBOT discussed the negative impact Senator

24   B's proposed legislation would have on Pacific Hospital and other

25   hospitals.

26   Overt Act No. 11

27   On or about June 29, 2012, defendant DROBOT caused a kickback in

28   the amount of $100,000 to be paid to S.O. for the referral of lumbar

11

1    and cervical spinal surgeries performed at Pacific Hospital,

2    including on patients covered by the FECA.

3         Overt Act No. 12

4         On or about August 1, 2012, defendant DROBOT authorized Senator

5    Calderon's son to be paid a gross salary of $18,510.90 for clerical

6    work Senator Calderon's son was performing at one of defendant

7    DROBOT's companies in order to guarantee that Senator Calderon's

8    son's take-home (or net) salary totaled approximately $10,000 for the

9    summer of 2012.

10        Overt Act No. 13

11        On or about January 18, 2013, defendant DROBOT caused a check in

12   the amount of $51,115.44 from Traveler's Insurance to be sent by mail

13   to Pacific Hospital in reimbursement for a claim for spine surgery on

14   patient F.C. performed by doctor T.R., which claim was induced by the

15   payment of a kickback to T.R.

16        Overt Act No. 14

17        On or about January 24, 2013, defendant DROBOT caused a check in

18   the amount of $117,142.36 from Vanliner to be sent by mail to Pacific

19   Hospital in reimbursement for a claim for spine surgery on patient

20   S.F. performed by doctor G.A., which claim was induced by the payment

21   of a kickback to G.A.

22        Overt Act No. 15

23        On or about April 24, 2013, defendant DROBOT caused a check in

24   the amount of $24,209.90 from ICW to be sent by mail to Pacific

25   Hospital in reimbursement for a claim for spine surgery on patient

26   F.A. performed by doctor L.T., which claim was induced by the payment

27   of a kickback to L.T.

28

<u>Overt Act No. 16</u>

On or about November 27, 2013, defendant DROBOT caused a check in the amount of $50,903.76 from Traveler's Insurance to be sent by mail to Pacific Hospital in reimbursement for a claim for spine surgery on patient T.V. performed by doctor L.T., which claim resulted from the payment of a kickback to A.I.

COUNT TWO

[42 U.S.C. § 1320a-7b(b)(2)(A)]

17.    Paragraphs one through eleven of this Information are re-alleged and incorporated as if fully set forth herein.

18.    Beginning in or around 1998 and continuing to in or around November 2013, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendant DROBOT, together with other co-conspirators known and unknown to the United States Attorney, knowingly and willfully offered and paid remuneration, that is, cash and checks, directly and indirectly, to persons to induce those persons to refer individuals to Pacific Hospital for spinal surgery and other medical services for which payment could be made in whole and in part under a Federal health care program, namely, the FECA.


ANDRÉ BIROTTE JR.
United States Attorney

ROBERT E. DUGDALE
Assistant United States Attorney
Chief, Criminal Division

DENNISE D. WILLETT
Assistant United States Attorney
Chief, Santa Ana Branch Office

JEANNIE M. JOSEPH
Assistant United States Attorney
Deputy Chief, Santa Ana Branch

JOSHUA M. ROBBINS
Assistant United States Attorney